IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

Howard E. Sims,                         )
                                        )   Civil Action No. 6:08-4156-MBS-WMC
                    Plaintiff,          )
                                        )   **REPORT OF MAGISTRATE JUDGE**
        vs.                             )
                                        )
Michael J. Astrue,                      )
Commissioner of Social Security,        )
                                        )
                    Defendant.          )
_____  )

        This case is before the court for a report and recommendation pursuant to

Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this

District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

        The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of

the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial

review of a final decision of the Commissioner of Social Security denying his claims for

disability insurance benefits and supplemental security income benefits under Titles II and

XVI of the Social Security Act.


                    **ADMINISTRATIVE PROCEEDINGS**

        The plaintiff previously applied for disability benefits in August 1992, alleging

disability due to a closed head injury from a motor vehicle accident (see Tr. 15, 342). He was

awarded benefits with an onset date of disability of July 30, 1992 (Tr. 342).  After a hearing

on the plaintiff's continuing disability review, an ALJ issued a decision on February 8, 2005,

finding he had medically improved and no longer qualified for disability benefits under the

Act (*see* Tr. 342-52).

_____

    [1]A report and recommendation is being filed in this case, in which one or both parties declined to
consent to disposition by the magistrate judge.

The plaintiff filed his current applications for disability insurance benefits (DIB) and supplemental security income (SSI) benefits on March 16, 2005, alleging that he became unable to work on December 1, 1992. The applications were denied initially and on reconsideration by the Social Security Administration. On January 19, 2006, the plaintiff requested a hearing. The administrative law judge, before whom the plaintiff, his attorney, a witness, and a vocational expert appeared on August 14, 2007 & September 20, 2007, considered the case *de novo*, and on November 27, 2007, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The administrative law judge's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on December 11, 2008. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

> (1)     The claimant met the insured status requirements of the Social Security Act only through March 31, 2003.
>
> (2)     The claimant has not engaged in substantial gainful activity since February 8, 2005, the date barred by res judicata (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).
>
> (3)     The claimant has the following severe impairments: status-post motor vehicle accident with head injury and organic brain syndrome, status-post left leg fracture with rod placement, status-post crushed pelvis with surgical repair, chronic pain syndrome, degenerative joint disease of the left hip, radiculopathy of the left leg, displaced tibial plateau fracture of the left leg with open reduction internal fixation, and depression (20 CFR 404.1520(c) and 416.920(c)).
>
> (4)     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

2

(5)     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work which is limited to reading at the fifth grade level; with spelling at the fourth grade level; limited to simple, routine work; in a low stress environment (which is defined as requiring few decisions); with no ongoing interaction with the public; with occasional balancing, stooping, kneeling, crouching and crawling; with no climbing of ladders, ropes or scaffolds; with avoidance of hazards such as unprotected heights and dangerous machinery; and with sitting, standing and walking a maximum of one hour at a time.

(6)     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

(7)     The claimant has a limited education and is able to communicate in English (20 CFR 44.1564 and 416.964).

(8)     The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

(9)     The claimant does not have any transferable skills from his past relevant work to work within his residual functional capacity (20 CFR 404.1568 and 416.968).

(10)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

(11)    The claimant has not been under a disability, as defined in the Social Security Act, from February 8, 2005, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and

who are under a "disability."  42 U.S.C. §423(a).  "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520.  If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a).  *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.  SSR 82–62.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. §423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

4

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 49 years old on the date of the ALJ's decision. He suffered a fractured pelvis and left ankle, as well as a head injury, during a motor vehicle accident in 1992. The plaintiff applied for and received disability benefits with an onset date of July 30, 1992. By a decision dated February 8, 2005, an ALJ found that the plaintiff medically improved and no longer qualified for disability benefits. In March 2005, the plaintiff filed a new application for disability benefits, alleging disability beginning December 1, 1992. However, the ALJ in this matter limited the plaintiff's new application to the period after

February 8, 2005, since *res judicata* prevented consideration of the previously adjudicated period. The plaintiff continued to report residual effects from this injury during the relevant time period.

### Medical Evidence

The record reveals that the plaintiff was treated by multiple care providers at Lovelace Family Practice from March 2004 through April 2005, primarily for reported pain in his left lower extremity. His past medical history included a positive test for tuberculosis, high cholesterol, drug abuse, cataract removal (Tr. 144-45), motor vehicle accident, tobacco use, and arthritis (Tr. 132-36).

The plaintiff reported to Dr. Oscar Lovelace on March 3, 2004, for a comprehensive physical examination. He did "not have any concerns for today's visit." He requested a prescription for a cane to assist with ambulation. The plaintiff denied any history of mental problems and indicated he had not been diagnosed with depression or anxiety. He denied recurring headaches, joint swelling, stiffness, or pain; but reported periodic pain to the left hip and ankle. Dr. Lovelace described him as "well appearing" and "in no distress" and alert and oriented to person, place, and time. The physical examination was primarily normal. The plaintiff demonstrated normal strength in his upper and lower extremities. He reported that he attempted to walk and ride his bicycle. He reported having arthritis aches, but indicated he never took the medication given to him and did "not desire any meds at this time." Dr. Lovelace wrote a prescription for a cane, indicating that the plaintiff had lost his cane and was requesting a prescription renewal (Tr. 140-46).

The plaintiff presented to Dr. Chip Dixon at Lovelace Family Practice on May 17, 2004, reporting a knot in the middle of his upper chest. Dr. Dixon ordered a CT scan (Tr. 137).

The plaintiff followed up with Lovelace Family Practice, on August 18, 2004. The CT scan of the plaintiff's chest showed benign (mild or non-malignant) bony protuberances (swelling or knob-like outgrowth) and a small, calcified granuloma (nodular inflammatory lesions) (Tr. 135).

Odette Fisher-Glover, FNP, noted that the plaintiff was depressed, although he denied suicidal thoughts. Her notes stated that the plaintiff sought mental health treatment at the clinic in Newberry, and that the plaintiff "goes there because it helps him get his Social Security." The plaintiff reported that his back and left hip had been hurting; he previously fractured the hip in a motor vehicle accident. During the physical exam, the plaintiff was pleasant and in no physical distress; his mood was somewhat blunted; and he maintained good eye contact. Ms. Fisher-Glover prescribed Lexapro and recommended follow-up in four weeks (Tr. 132-36).

The plaintiff followed up with Dr. Jeffrey Hall at Lovelace Family Practice on September 15, 2004, reporting that he stopped taking the Lexapro after two weeks because he was drinking 46-64 ounces of beer per day. Dr. Hall noted that the plaintiff did not eat often and continued to have significant weight loss. The plaintiff previously went for a two-month inpatient alcohol rehabilitation treatment program, but left on his own after about 3½ weeks. Dr. Hall wrote that the plaintiff lied to his counselor at mental health about his drinking and medication and spent time with his family members who drank heavily. Dr. Hall again referred the plaintiff to an inpatient alcohol rehabilitation program (Tr. 129-31).

The plaintiff sought treatment from Dr. Alfred Ebert at the Newberry Mental Health Clinic from September 2004 through June 2005. The plaintiff presented to Dr. Ebert on September 24, 2004, complaining of short-term memory problems and difficulty focusing. He indicated that his "mood may be down a little bit occasionally, but that he does not like taking medicines." The plaintiff stated in regard to substance use history "[h]e began the use at the age of 12 years, drinking and some marijuana. Admits on and off throughout his

7

life, marijuana, cocaine and alcohol ... He continues to use." He was appropriately dressed, pleasant and cooperative, with good attention and concentration. During the mental status examination, the plaintiff discussed his situation intelligently and his mood was good. Dr. Ebert assessed the plaintiff as "fairly stable" and recommended no psychiatric medication and continuation of group therapy . Dr. Ebert's impression was a psychotic disorder, secondary to closed head injury, rule out psychotic disorder, not otherwise specified (NOS). A handwritten note by Dr. Ebert dated September 27, 2004, indicated that after further persuasion, the plaintiff started Abilify[2] (Tr. 148-54).

The plaintiff presented to Dr. Ebert on November 10, 2004, feeling that "things are going pretty well. He denies any problems today." He was not taking any medication because he indicated he did not need them. He continued to have pain. The plaintiff was appropriately dressed, neat and clean; was cooperative and friendly; maintained good eye contact; his speech was normal in tone and volume; and he discussed issues correctly. Dr. Ebert diagnosed a psychotic disorder NOS (Tr. 152).

On follow-up with Dr. Ebert on March 23, 2005, the plaintiff stated that he had not taken any medication for three to four months and did not feel Abilify helped him. The plaintiff denied thoughts of hurting himself or others, denied panic attacks, stated that he left his house at will, reported his mood as good with no crying spells or mood swings. He reported that he was generally sleeping well at night and had good energy during the day. He "repetitively denie[d] any alcohol or street drugs." Dr. Ebert described the plaintiff as nicely dressed in newer clothes that were appropriate, neat, and clean. The plaintiff demonstrated good attention and concentration; his speech was normal; he discussed his problems intelligently; his thought process was linear. His mood was euthymic (normal or

---

[2]An antipyschotic prescription medication used to treat psychotic conditions such as schizophrenia, bipolar disorder, and depression. *See http://www.drugs.com/abilify.html.*

stable mood) and his affect brightened at appropriate times. Dr. Ebert recommended continuing with no medication and return to clinic in three months (Tr. 150-51).

The plaintiff presented to Dr. Lovelace on April 7, 2005, for follow-up. At that time, he reported feeling anxious and having some difficulty sleeping and showed up with a can of beer in his bag. Dr. Lovelace's notes indicated that the plaintiff was previously prescribed the anti-depressant Lexapro, but he stopped taking it. Dr. Lovelace again prescribed Lexapro for the plaintiff's chronic pain syndrome (Tr. 125-28).

State agency psychiatrist Lisa Varner, Ph.D., reviewed the available evidence of record and completed a psychiatric review technique form on June 7, 2005. She opined that the plaintiff had a mild degree of limitation in activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace. Dr. Varner opined that the plaintiff's symptoms and impairments imposed "minimal limitations on his ability to perform basic work functions" (Tr. 226-39).

On June 9, 2005, the plaintiff presented to the Newberry Free Health Clinic[3] reporting pain in both shoulders, legs, and left hip for two weeks. The plaintiff walked with a cane but demonstrated no edema. The care provider recommended a trial on Celebrex.

The plaintiff returned to Dr. Ebert on June 22, 2005, for his three-month follow-up and prescription medication assessment. The plaintiff indicated he was taking Lexapro for pain reduction. He described his mood as good. "We do spend some time discussing whether he really needs to come to Mental Health. He states that it really helps him because it is a nice and safe place, where he feels people care about him. He also says at times he does feel like he gets mistrustful and paranoid. He feels that this type of therapy helps him quite a bit." He denied using alcohol or street drugs. The plaintiff was cooperative and friendly with good eye contact; his speech was normal in volume and tone and easily understood; he demonstrated no evidence of paranoia; his thought process was linear and

_____
[3]The treatment notes from Newberry Clinic do not identify the care providers by name.

9

he maintained his place in the conversation. Dr. Ebert assessed the plaintiff's condition as about the same or a little better, even though he was not taking any antipsychotic medication. Dr. Ebert again recommended the plaintiff continue without medication and follow up in three months or as needed (Tr. 148).[4]

The plaintiff returned to the Newberry Clinic on August 4, 2005, for follow-up on his ankle and hip pain. He reported improvement in his hip pain with Celebrex. He talked about feeling depressed, but he was eating and sleeping well. The plaintiff seemed to be in a better mood; he was still limping and walking with a cane. The care provider assessed chronic pain syndrome and recommended continuing Celebrex and adding Zoloft (Tr. 155).

The plaintiff followed up with the Newberry Free Health Clinic in August 2005 for left ankle pain. He reported that overall his pain was better; he was still using a cane but getting around more. He declined Zoloft (Tr. 261).

State agency psychiatrist B.C. Price, Ph.D., reviewed the available evidence and completed a Psychiatric Review Technique form on August 7, 2005. He opined that the plaintiff had a mild degree of limitation in activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace. Dr. Price concluded that "Overall, the evidence suggests that his mental health condition imposes minimal limitations on his ability to perform work functions. - Not severe." (Tr. 197-210).

At the request of the Commissioner, Dr. W. Russell Rowland examined the plaintiff on September 2, 2005. The plaintiff's chief complaints were residuals from a broken left ankle and a crushed pelvis. The plaintiff complained of pain in his left ankle when he started walking and pain in his pelvic area. He reported walking about one hour and 40 minutes to his mother's house every day because he was bored; he reported that his pain went away upon arriving. He also reported sometimes riding his bicycle to his mother's house. The plaintiff reported that the distance to his mother's house was about nine to 11

---

[4]After this date, there are no further records from Dr. Ebert.

miles.  He reported having a 10th-grade education and no problems reading and writing. The plaintiff reported cooking and cleaning house.  The examiner opined that the plaintiff appeared responsible to handle money.  During the mental status examination, the plaintiff presented a pleasant mood with fair communication skills, and was oriented to month, date, day, location, and the name of the president.  He was neatly dressed in a dress shirt and slacks.  He had a mild antalgic gait (limp to avoid pain) using his cane, and a moderate limp on the left without the cane.  He reported the limp was due to pain in his left ankle and left hip.  Later in the examination, Plaintiff "walked perfectly with no limp" during various gait testing (Tr. 157-58).

During physical examination, the plaintiff showed right hip flexion to 135 degrees, left hip to 125 degrees, with both extending to zero degrees.  The left ankle showed limited dorsiflexion to 5 degrees, but normal plantar flexion and inversion.  The plaintiff showed normal spinal alignment and no tenderness over the lower back, pelvic, or hip areas.  Dr. Rowland's impression was that the plaintiff had a lot of complaints and walked with a limp until he tricked the plaintiff and the limp went away.  Dr. Rowland concluded, "I really find no limitation." (Tr. 159-60).

State agency physician Dr. Joan Crennan reviewed the evidence and completed a residual functional capacity assessment on September 23, 2005.  She opined that the plaintiff was capable of lifting 50 pounds occasionally and 25 pounds frequently; standing, walking, or sitting for about six hours each during an eight-hour workday; climbing ladders, ropes, and scaffolds occasionally; and crouching occasionally (Tr. 189-96).

At the request of the Commissioner, Richard Cohen, Ph.D., performed a mental status examination of the plaintiff on October 14, 2005.  In his psychiatric history, the plaintiff reported going to Newberry Mental Health Center for group therapy.  He was not taking any psychotropic medications. The plaintiff had no public psychiatric hospitalizations and had not received mental health services, outpatient or inpatient, in the private sector.

In his activities of daily living, the plaintiff reported no hobbies. He reported going to the grocery store, cooking, washing dishes, and doing housework. During the evaluation, the plaintiff was cooperative and reserved. His mental status evaluation was within normal limits. The plaintiff's full-scale IQ was 66. He reported being depressed two days per week, Monday and Wednesday, for six hours. He demonstrated adequate remote and recent memory, but his short-term memory was poor. Dr. Cohen concluded that the plaintiff's concentration was adequate for one-to-two step work tasks (Tr. 161-64).

State agency psychiatrist Xantha Harkness, Ph.D., completed a mental residual functional capacity assessment on November 16, 2005. Dr. Harkness concluded that the plaintiff was moderately limited in his ability to carry out detailed instructions and in his ability to set realistic goals or make plans independently of others. Dr. Harkness otherwise opined that the plaintiff was not significantly limited in his understanding and memory, sustained concentration and persistence, social interaction, and adaptation. Dr. Harkness opined that the plaintiff was able to remember location and work-like procedures and understand and remember short and simple instructions. Further, he opined that the plaintiff could attend to and perform simple tasks without supervision for at least two-hour periods. He concluded that the plaintiff's symptoms would not interfere with satisfactory completion of a normal workday/week or require an unreasonable number of rest or cooling off periods. Dr. Harkness indicated that the plaintiff was able to sustain socially appropriate work behavior, standards, and appearance; would respond appropriately to changes in a routine setting; and his mental status evidence indicated the ability to perform simple, unskilled work (Tr. 170-72).

The plaintiff reported to the Newberry Clinic in November 2005 for a routine checkup, reporting left shoulder, left hip, and ankle pain (Tr. 261).

The plaintiff sought care from Phillip Milner, D.O., and Dr. John Hibbits at Palmetto Bone and Joint for treatment of a tibial plateau fracture from November 2005

through March 2007. He presented to Dr. Milner on November 28, 2005, after stepping into a hole and sustaining a tibial plateau fracture in his left knee. Dr. Milner noted the plaintiff's past medical history was significant for a previous lower leg fracture, followed by development of osteoarthritis in the ankle. The plaintiff reported taking Celebrex for his osteoarthritis of the ankle. Dr. Milner ordered a CT scan to determine whether surgery was necessary for the knee fracture. Dr. Hibbits read the CT scan as showing a tibial plateau split compression fracture and recommended surgery on the knee. Dr. Hibbits noted that other than being a smoker and occasional drinker, the plaintiff had no active medical problems (Tr. 281).

The plaintiff underwent open reduction and internal fixation (ORIF) surgery on his left knee on December 1, 2005. At his six-day follow-up, Dr. Hibbits recommended the plaintiff remain strictly non-weightbearing until further evidence of healing. At his six-week follow-up, the plaintiff reported to Dr. Hibbits that he had been trying to walk on the leg and sustained a fall at home, landing on the outer portion of his left leg. The fall caused the knee wound to split open. Dr. Hibbits scheduled surgery the following day for irrigation (cleaning) and debridement (removal of foreign matter) of the wound. (Tr. 280).

On December 15, 2005, the plaintiff reported to the Newberry Clinic wearing a brace on his left leg; the notes indicated decreased swelling across his left ankle. The plaintiff reported that Celebrex helped his hip and ankle pain (Tr. 260).

On February 15, 2006, Dr. Hibbits noted that the plaintiff had been more compliant with his brace wear and crutches. The plaintiff demonstrated full range of motion in his knee. Dr. Hibbits recommended weaning off the crutches and out of the brace. By March 15, 2006, Dr. Hibbits recommended the plaintiff transition back to normal activity, including discarding the knee brace. Dr. Hibbits noted that the plaintiff was "able to ambulate unlimited distance" (Tr. 278-79).

13

On March 22, 2006, Dr. Hibbits found the plaintiff had infected hardware and scheduled surgical removal of the hardware, along with another round of irrigation and debridement. Following the surgery, Dr. Hibbits "had a frank discussion with [Plaintiff] regarding the importance of him complying and assisting with his recovery" (Tr. 278).

The plaintiff was a no-show for an appointment at the Newberry Clinic on March 23, 2006 (Tr. 260).

On April 5, 2006, the plaintiff reported to Dr. Hibbits with persistent drainage at his wound and had not gone to therapy despite Dr. Hibbits' instructions for wound care. Again on April 19, Dr. Hibbits noted that the plaintiff still had not been going to therapy (Tr. 277).

The plaintiff attended outpatient physical therapy at the Newberry Hospital from April 21, 2006, to May 12, 2006, with the goals of wound healing, increased strength in his left side, and to normalize his gait pattern. The plaintiff was discharged from therapy on May 12, 2006, after meeting his physical therapy goals (Tr. 262-73).

On May 18, 2006, the plaintiff reported for a follow-up visit at Newberry Clinic for pain in his left leg following an accident. At this time, the plaintiff was referred to vocational rehabilitation. Notes from the Newberry Clinic on November 30, 2006, when the plaintiff reported for follow-up on pain in his left leg and a corn on his big toe, indicate that he still had not been seen at vocational rehabilitation. The plaintiff continued routine checkups at the Newberry Clinic. On May 17, 2007, he reported to the Newberry Clinic wearing a left knee brace; he indicated that it helped "some." The plaintiff walked with a limp and presented with a cane (Tr. 255-59).

On June 14, 2006, Dr. Hibbits noted that the plaintiff experienced no pain during the day in his left knee, was ambulating with a cane, and demonstrated full range of motion in the left knee. Dr. Hibbits prescribed antibiotics to treat the plaintiff's continued drainage from the wound and eventually implanted antibiotic beads (Tr. 276-77). By October

14

2006, the plaintiff's wound had healed, but he demonstrated weak ankle dorsiflexion due to the repeated surgical procedures (Tr. 275). In November 2006, the plaintiff continued to have no real complaints of pain, remained ambulatory without difficulty, demonstrated no swelling or tenderness, and walked with essentially a normal gait (Tr. 275). On March 28, 2007, Dr. Hibbits discharged the plaintiff from his care (Tr. 274).

Dr. John W. Green, of the Newberry Clinic, submitted a two-sentence letter "to whom it may concern," dated September 4, 2007, indicating his opinion that the plaintiff was disabled (Tr. 289).

Dr. Green also completed a mental residual functional capacity questionnaire and an opinion on the plaintiff's physical abilities to perform work-related activities on September 17, 2007. Dr. Green assessed the plaintiff with organic brain syndrome following a head injury and depression. He opined that the plaintiff had "no useful ability to function" in understanding and remembering very short and simple instructions; carrying out very short and simple instructions; maintaining attention for a two-hour segment; accepting instructions and responding appropriately to criticism from supervisors; and responding appropriately to changes in a routine work setting. Dr. Green also opined that the plaintiff would be unable to meet competitive standards for remembering work-like procedures and performing at a consistent pace without an unreasonable number and length of rest periods. Dr. Green indicated that the plaintiff had a very good ability to carry out detailed instructions, but would be unable to meet competitive standards for understanding and remembering detailed instructions. Dr. Green indicated that he "would anticipate" that the plaintiff had a low IQ or reduced intellectual functioning, but did not provide any explanation for this answer. Dr. Green opined that the plaintiff's alcohol or substance abuse did not contribute to any of the opined limitations. Dr. Green opined that the plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently. Dr. Green opined that the plaintiff could stand, walk, or sit for about two hours each during an eight-hour workday. He further

indicated that the plaintiff could sit or stand for only five minutes at one time before needing to change positions and must walk around about every 10 minutes for 10 minutes at a time. In response to the question, "Does your patient need the opportunity to shift *at will* from sitting or standing/walking?" (emphasis in original), Dr. Green responded "yes." Dr. Green opined that the plaintiff would need to lie down about every 30-40 minutes during a work shift. Dr. Green opined that the plaintiff could never stoop, crouch, climb stairs, or climb ladders; and only occasionally twist (Tr. 295-98).

### Plaintiff's Statements and Testimony

The plaintiff testified that he lived by himself in an apartment for the handicapped and disabled at the Newberry Housing Authority (Tr. 310, 319). He did not pay rent for the apartment, but did community service work to maintain his apartment (Tr. 310). He testified that he worked at the community gym from 10 or 11 a.m. until 4 or 5 p.m. each day (Tr. 312). His duties included putting out snacks for the children, mopping the floor, and taking out the trash (Tr. 312). He stated that he sometimes left the gym to deliver a message to the office (Tr. 312), chat with the ladies in the office (Tr. 314), or go home and sit down (Tr. 313). The plaintiff testified that the children at the gym where he worked were five to 15 years old (Tr. 315).

The plaintiff testified that since his bicycle accident, his leg was always hurting (Tr. 315). He indicated that he experienced a car accident in 1992 that resulted in a left ankle fracture, crushed pelvic bone, and a serious head injury that caused him to be in a coma for about four months (Tr. 316). He stated that he hurt his left side again when he broke his leg after he "missed stump and hit the ditch" (Tr. 317). He testified that this injury required surgery about eight or nine months prior to the hearing (Tr. 318). The plaintiff testified that the pain in his leg feels like someone stabbed him with a knife or pen (Tr. 318).

16

He stated that his left side is always hurting (Tr. 318). He testified that he experienced pain in his head that felt like swelling or somebody squeezing his head (Tr. 322).

The plaintiff stated that he had used a cane since 1992, mostly for balance (Tr. 318). He testified that he had been seeing Dr. Green at the free clinic for about four years (Tr. 321). He stated that he did not have a driver's license; he received rides from his sister and counselor (Tr. 321-22). The plaintiff testified that he had problems with depression and was glad he stayed by himself; when he experienced depression, he stated that he would go home and watch television (Tr. 322). He said that he was afraid to be around other people because he might say something bad (Tr. 322). The plaintiff testified that he started drinking beer again; he got the beer from guys on his mother's softball team (Tr. 324). He stated that he stopped doing cocaine four years prior (Tr. 324).

### Lay Testimony of John Glasgow

John Glasgow, deputy director for the Newberry Housing Authority where the plaintiff resided, testified on behalf of the plaintiff (Tr. 326-33). He said that the plaintiff was in and out of the Housing Authority office daily, and he sometimes attended church with him on Sunday (Tr. 326). Mr. Glasgow testified that the plaintiff occasionally lost his temper with the Housing Authority staff; but that the staff had learned to tolerate his behavior (Tr. 327). Mr. Glasgow stated that the plaintiff worked at the Housing Authority gym as a requirement for his stay, where he assisted children present for after-school programs (Tr. 328). He testified that the plaintiff mopped the floor, swept, washed windows, and helped the children with trays (Tr. 328).

Mr. Glasgow stated that he was familiar with the signs of alcohol and drug abuse and evicted people from the Housing Authority in the past for such behavior (Tr. 330). He testified that he had never observed the plaintiff abusing alcohol or showing signs of drunkenness (Tr. 329). Mr. Glasgow testified that if he had observed alcohol problems, he

would not have allowed the plaintiff to be around the office staff or the children at the gym (Tr. 329). Mr. Glasgow testified that, prior to the plaintiff's most recent bicycle accident, he was able to ride his bike around town (Tr. 330-31). After the accident, the plaintiff used the bicycle more as a walking crutch than for riding (Tr. 331). However, Mr. Glasgow testified that the plaintiff still rode the bicycle "a little bit" (Tr. 331).

Mr. Glasgow testified that it was sometimes difficult to follow the plaintiff's train of thought during a conversation (Tr. 331). Mr. Glasgow testified that he did not think the plaintiff could hold down a job and that he would not hire the plaintiff (Tr. 332).

### *Vocational Expert Testimony*

The ALJ asked vocational expert Adger Brown to assume a hypothetical person of the plaintiff's age, prior education, and occupational experience who was limited to simple, routine, light work, in a low stress environment, with no ongoing interaction with the public (Tr. 335):

> Assume an individual who is limited to light exertional work as defined in the regulations, and assume an individual who reads at the fifth grade level, spells at the fourth grade level, who has the following restrictions. Because of mental problems: is limited to simple, routine work; a low stress environment, and that's one I define as requiring few decisions; no ongoing interaction with the public; no more than occasional balancing, stooping, kneeling, crouching and crawling; no ladders, no ropes, no scaffolds; avoidance of hazards such as unprotected heights and dangerous machinery.

Mr. Brown testified that such a person could perform the light, unskilled positions of quality control inspector[5] (3,900 jobs in the regional economy and 120,000 nationally), parts packer[6] (3,500 in the regional economy and 112,000 nationally), and product testers, sampler, or

---

[5]*Dictionary of Occupational Titles* (DOT) nos. 653.687-010 and 559.687-058.

[6]DOT nos. 525.687-118 and 585.687-030.

weigher[7] (250 in the regional economy and 12,000 nationally) (Tr. 335). Mr. Brown testified that these jobs could still be performed by someone who had to sit, stand, or walk for up to an hour at a time (Tr. 335-36).

## ANALYSIS

The plaintiff was 49 years old on the date of the ALJ's decision. He suffered a fractured pelvis and left ankle, as well as a head injury, during a motor vehicle accident in 1992. He applied for and received disability benefits with an onset date of July 30, 1992. By a decision dated February 8, 2005, an ALJ found that the plaintiff medically improved and no longer qualified for disability benefits. In March 2005, the plaintiff filed a new application for disability benefits, alleging disability beginning December 1, 1992. However, the ALJ in this matter limited the plaintiff's new application to the period after February 8, 2005, finding *res judicata* prevented consideration of the previously adjudicated period. The ALJ found that the plaintiff has the residual functional capacity to perform light work which is limited to reading at the fifth-grade level; with spelling at the fourth-grade level; limited to simple, routine work; in a low stress environment (which is defined as requiring few decisions); with no ongoing interaction with the public; with occasional balancing, stooping, kneeling, crouching and crawling; with no climbing of ladders, ropes or scaffolds; with avoidance of hazards such as unprotected heights and dangerous machinery; and with sitting, standing and walking a maximum of one hour at a time.

The plaintiff argues that the ALJ erred by (1) failing to reconsider the February 2005 decision, which found that his disability ceased in September 2002; (2) failing to properly consider the opinions of his treating physician, Dr. Green, and examining physician Dr. Cohen; (3) failing to properly evaluate his credibility; (4) failing to consider all of his

---

[7]DOT nos. 732.687-086 and 727.687-078.

limitations in evaluating his RFC; and (5) failing to include all of his limitations in the hypothetical question to the vocational expert.

***February 2005 Decision***

The plaintiff argues that the ALJ erred by failing to reconsider the February 2005 decision finding his disability ceased in September 2002. The Commissioner argues that *res judicata* bars consideration of the time period prior to February 8, 2005.

Section 205(h) of the Act, 42 U.S.C. § 405(h), provides that findings by the Commissioner after a hearing shall be binding on all individuals party to the hearing and shall not be reviewed except as explicitly provided in the Act. Where an ALJ's decision has become the final decision of the Commissioner, "*[r]es judicata* bars attempts to relitigate the same claim." *Albright v. Comm'r of Soc. Sec.*, 174 F.3d 473, 475 (4th Cir. 1999); *see also Lively v. Sec'y of Health and Human Servs.*, 820 F.2d 1391, 1392 (4th Cir. 1987) (noting that "*res judicata* prevents reappraisal of both the [Commissioner's] findings and his decision in Social Security cases that have become final"); *Shrader v. Harris*, 631 F.2d 297, 300-01 (4th Cir. 1980) (noting incorporation of the doctrine of *res judicata* in the Commissioner's regulations); 20 C.F.R. § 404.957(c)(1).

In *Albright*, the court explicitly found the ALJ's dismissal of the plaintiff's claims for disability before the date of the prior ALJ decision proper. "To the extent that a second or successive application seeks to relitigate a time period for which the claimant was previously found ineligible for benefits, the customary principles of preclusion apply with full force." *Albright*, 174 F.3d at 476 n.4.

The doctrine of *res judicata* is limited to claims that involve the same facts and issues as in a previous decision. 20 C.F.R. §§ 404.957(c)(1), 416.1457(c)(1). Accordingly, *res judicata* does not apply when new and material evidence has been presented that is applicable to the previously adjudicated period. The agency's procedural manual instructs

ALJs that when a claimant submits new and material evidence in connection with the current claim, the facts are not the same as in the earlier claim and *res judicata* does not apply. HALLEX I-2-4-40, 2005 WL 1870458. Social Security Ruling 68-12a instructs that a prior, final, determination denying benefits does not preclude a finding the claimant was disabled during the previously-adjudicated period where there is new and material evidence applicable to that period. SSR 68-12a, 1968 WL 3926.

The plaintiff points to the following evidence as new and material to the period previously adjudicated: the testimony of John Glasgow, deputy director for the Newberry Housing Authority where the plaintiff resided since 2002, who testified about the plaintiff's memory problems, difficulty keeping a train of thought, and unpredictable outbursts (Tr. 326-33); Dr. Green's diagnosis of the plaintiff with Organic Brain Syndrome and depression with no improvement anticipated (Tr. 290-94); and the report of consultative examiner Dr. Cohen, who examined the plaintiff in October 2005 and determined that the plaintiff has a full-scale IQ of 66 and short-term memory deficit (Tr. 161-67).

The plaintiff further argues that the mental capacity exception to the application of *res judicata* applies to his case. The Fourth Circuit Court of Appeals has held that the Secretary shall not apply concepts of *res judicata* or administrative finality (reopening) when a claimant shows a *prima facie* case of mental incompetence during the previously adjudicated period and the individual lacked legal assistance during that time. *See Shrader v. Harris*, 631 F.2d 297, 301-02 (4th Cir. 1980); *Culbertson v. Sec'y of Health & Human Svc's*, 859 F.2d 319, 322-23 (4th Cir. 1988) (finding the *Shrader* holding equally applicable to the doctrine of administrative finality). While the Commissioner argues that the mental incapacity exception applies only when a claimant has missed a step in the administrative proceedings and not when a claimant, like the plaintiff, has missed the deadline for a federal court appeal, the Social Security Administration's Hearings, Appeals, and Litigation Law Manual ("HALLEX") states otherwise:

21

> Whenever an ALJ considers the application of administrative finality or *res judicata* to a determination or decision that was made on a prior application, and there is evidence that a claimant lacked the mental capacity to timely request review of an adverse determination, decision, dismissal, *or a review by a federal district court*, and the claimant had no one legally responsible for prosecuting the claim, the ALJ must address and resolve in the current decision the issue of whether the claimant lacked the mental competence to pursue his appeal.

HALLEX I-2-4-40, 2005 WL 1870458 (emphasis added). Furthermore, the HALLEX instruction explains in a note that in the Fourth Circuit an ALJ must hold a separate on-the-record evidentiary hearing on the issue of the claimant's competence at the time of the prior determination or decision before applying the doctrine of *res judicata*. *Id.* (citing *Culbertson*, 859 F.2d 319 and *Young v. Bowen*, 858 F.2d 951 (4th Cir. 1988)). The HALLEX instruction further provides:

> If, after such hearing, the ALJ finds that the claimant was not mentally competent at the time of the final determination or decision on the prior claim, the ALJ must: 1) issue a separate decision on the mental competency issue, and 2) provide the claimant a full hearing and decision on all issues raised by the prior and current claims. The ALJ may not dismiss the request for hearing on the basis of *res judicata*.
>
> If, however, the ALJ finds that the claimant was mentally competent at the time of the final determination or decision on the prior claim, the ALJ must 1) issue a separate decision on the mental competency issue, and 2) and proceed with action on the request for hearing in the usual manner. The ALJ may dismiss the request for hearing on the basis of *res judicata* if the conditions for *res judicata* are met.

*Id.*

The evidence in the record shows that the plaintiff has a full-scale IQ of 66 and a short-term memory deficit (Tr. 163-64). His treating physician noted that the plaintiff has poor cognition, that he cannot handle his checkbook, and that he is unable to read about twenty percent of the words in the Social Security disability forms (Tr. 255). As argued by the plaintiff, this evidence establishes mental abilities that do not change from year to year,

and it makes out a *prima facie* case that the plaintiff did not have the mental capacity to pursue an appeal after the 2004 hearing. The plaintiff was unrepresented in the proceedings that culminated in a hearing on July 13, 2004 (Tr. 342). The Appeals Council denied his request for review in late April of 2005 (Tr. 15). In June of 2005, instead of appealing, he filed a new application giving the date of his 1998 accident as the date when his disability began (Tr. 42-46). He was also unrepresented in 2007 when the original hearing was scheduled on his new claim, and the ALJ rescheduled the hearing for him to get a lawyer (Tr. 303).

Based upon the foregoing, this court recommends that, upon remand, the ALJ be instructed to hold a separate evidentiary hearing on the issue of whether the plaintiff was mentally competent at the time of the 2005 decision. Furthermore, the ALJ should be instructed to consider whether new and material evidence has been presented that is applicable to the previously adjudicated period such that *res judicata* would not apply.

The plaintiff further argues that the ALJ erred in failing to consider and discuss the findings from the 2005 decision and failing to include the 2005 decision in the record. After the plaintiff's brief was filed, the Commissioner filed a supplement to the administrative transcript that included the 2005 decision (docket no. 18). The Fourth Circuit has held that, under principles of finality and fundamental fairness extrapolated from Section 205(h) of the Act, the substantial evidence rule requires consideration of findings in prior administrative decisions. *See Albright*, 174 F.3d 473 (4th Cir. 1999) (clarifying its prior ruling in *Lively*, 820 F.2d 1391). Following these decisions, when adjudicating a subsequent disability claim involving an unadjudicated period, SSA considers the prior findings made in a final decision on a prior claim as evidence relevant to the unadjudicated period in the subsequent claim. *See* AR 00-1(4). Upon remand, the ALJ should be instructed to consider the findings in the 2005 decision in accordance with the above law.

***Treating Physician***

The plaintiff argues that the ALJ failed to properly consider the opinion of treating physician Dr. Green. The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 416.927(d)(2) (2006); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). However, statements that a patient is "disabled" or "unable to work" or meets the Listing requirements or similar statements are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-2p. Furthermore, even if the plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

The regulations provide that even if an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he still must consider the weight given to the physician's opinion by applying five factors: (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 404.1527(d)(2)-(5). Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. SSR 96-2p, 1996 WL 374188, *5. As stated in Social Security Ruling 96-2p:

> A finding that a treating source medical opinion is not well
> supported by medically acceptable clinical and laboratory
> diagnostic techniques or is inconsistent with the other
> substantial evidence in the case record means only that the
> opinion is not entitled to "controlling weight," not that the opinion
> should be rejected. Treating source medical opinions are still
> entitled to deference and must be weighed using all of the

> factors provided in 20 C.F.R. 404.1527 and 416.927. In many
> cases, a treating source's opinion will be entitled to the greatest
> weight and should be adopted, even if it does not meet the test
> for controlling weight.

*Id.* 1996 WL 374188, *4.

Dr. Green completed a mental residual functional capacity questionnaire and an opinion on the plaintiff's physical abilities to perform work-related activities on September 17, 2007. Dr. Green assessed the plaintiff with organic brain syndrome following a head injury and depression. He opined that the plaintiff had "no useful ability to function" in understanding and remembering very short and simple instructions; carrying out very short and simple instructions; maintaining attention for a two-hour segment; accepting instructions and responding appropriately to criticism from supervisors; and responding appropriately to changes in a routine work setting. Dr. Green also opined that the plaintiff would be unable to meet competitive standards for remembering work-like procedures and performing at a consistent pace without an unreasonable number and length of rest periods. He indicated that he "would anticipate" that the plaintiff had a low IQ or reduced intellectual functioning, but did not provide any explanation for this answer. He further opined that the plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently and could stand, walk, or sit for about two hours each during an eight-hour workday. He further indicated that the plaintiff could sit or stand for only five minutes at one time before needing to change positions and must walk around about every 10 minutes for 10 minutes at a time. In response to the question, "Does your patient need the opportunity to shift *at will* from sitting or standing/walking?" (emphasis in original), Dr. Green responded "yes." Dr. Green opined that the plaintiff would need to lie down about every 30-40 minutes during a work shift. Dr. Green opined that the plaintiff could never stoop, crouch, climb stairs, or climb ladders; and only occasionally twist (Tr. 295-98).

The ALJ found as follows with regard to Dr. Green's opinion:

> [I]n this instance, Dr. Green's extreme conclusions are not supported by his own treatment notes, which show few clinical findings. Dr. Green's conclusions are also not supported by treatment notes from other providers, including Dr. Ebert, the claimant's treating psychiatrist, or from the reports from the two consultative examinations, which are discussed below (Drs. Rowland and Cohen]. While Dr. Green's opinion has been considered, it has been given no weight since it is not supported by his clinical findings or by other evidence in the record to include the claimant's reported activities.

(Tr. 23).

Dr. Green made very specific findings in his opinion, and the ALJ erred in failing to weigh the factors described above before giving the opinion no weight. Further, even if the record supports successful treatment with medication, as pointed out by the Commissioner, it is no reason to ignore the regulations. The Commissioner also argues that the plaintiff's "limited mental health treatment did not support Dr. Green's opinion" (def. brief 23). However, this is a *post-hoc* rationalization not offered by the ALJ. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."). Furthermore, the plaintiff's point is well taken that a person who has suffered a traumatic head injury resulting in brain damage will not necessarily be cured of an inability to understand instructions and maintain attention by more extensive mental health treatment than the plaintiff received.

Based upon the foregoing, upon remand, the ALJ should be instructed to evaluate the opinion of Dr. Green in accordance with the above-cited law.

The plaintiff also argues that the ALJ erred in rejecting the opinion of examining psychologist Dr. Cohen, who concluded that the plaintiff has mild mental retardation (Tr. 166). The ALJ discussed these findings and noted that while the plaintiff's IQ scores were consistent with Listing 12.05, there was no evidence that the plaintiff's

26

significantly subaverage general intellectual functioning with deficits in adaptive functioning was manifested prior to age 22. In support of this conclusion, the ALJ noted that the plaintiff completed 10th grade in regular classes and that the vocational expert testified that the plaintiff's work history included semi-skilled work as a stocker (Tr. 24-25). The plaintiff argues that the ALJ's reason is not supported by the evidence and it is an improper substitution of the ALJ's inexpert opinion for the expert opinion of a trained psychologist. However, the Commissioner argues that the ALJ did not reject Dr. Cohen's opinion. Instead, the ALJ simply found that the plaintiff did not demonstrate the deficit in adaptive functioning prior to age 22, as required for the listing. This court agrees that the ALJ was not in error on this issue, and substantial evidence supports the finding.

### *Credibility*

The plaintiff next argues that the ALJ failed to properly evaluate his credibility. The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific

evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." SSR 96-7p, 1996 WL 374186, *4.

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)     the individual's daily activities;

(2)     the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)     factors that precipitate and aggravate the symptoms;

(4)     the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)     treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)     any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)     any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, *3.

The ALJ found that the plaintiff's testimony as to the intensity, persistence and limiting effects of his impairments was not "entirely credible and . . . not fully supported by the medical evidence" (Tr. 21). The ALJ noted that the plaintiff's treatment has been routine, conservative, and typically limited to medication, the record did not show frequent requests for stronger medication or treatment alternatives, and there were no emergency room visits

28

or hospitalizations noted in the record. The ALJ also noted that the plaintiff did not appear in pain or discomfort while testifying, and he had no difficulty participating in the hearing. The plaintiff argues, and this court agrees, that the absence of emergency room visits and hospitalization does not disprove brain damage or mental retardation.

The ALJ also discounted the plaintiff's and Mr. Glasgow's testimony that he has an explosive temper (Tr. 20). Mr. Glasgow testified that the plaintiff loses his temper and that his outbursts are inappropriate, unexplainable, and unprovoked (Tr. 327). The ALJ stated that if the plaintiff "truly had the explosive temper that he alleges, he would probably be prohibited from working around children" (Tr. 20). The ALJ also found that the medical evidence did not support the testimony regarding the plaintiff's temper. Dr. Ebert diagnosed the plaintiff with a psychotic disorder, post-accident with head trauma, and the diagnosis of organic brain syndrome as a result of traumatic brain injury is repeated throughout the record (Tr. 148, 290). The plaintiff notes that The Center for Disease Control Fact Sheet on symptoms that result from traumatic brain injury includes difficulty with control of temper. *See* http://www.cdc.gov/nipc/factsheets/tbi.htm. Also, Dr. Cohen reported the angry outbursts and neither questioned nor rejected them (Tr. 165). Based upon the foregoing, the ALJ's rejection of the plaintiff's testimony, along with the supporting testimony of Mr. Glasgow, regarding the plaintiff's explosive temper is not supported by substantial evidence. Upon remand, the ALJ should be instructed to consider this evidence in evaluating the plaintiff's RFC.

### Residual Functional Capacity

The plaintiff next argues that the ALJ failed to perform a proper analysis of his RFC and further that the ALJ failed to included all of his limitations and restrictions in the hypothetical question to the vocational expert. This court agrees.

> The Residual Functional Capacity ("RFC") assessment must include a narrative discussion describing how the evidence

29

supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work- related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved. . . .

SSR 96-8p, 1996 WL 374184, *7. Significantly, SSR 96-8p specifically states that "the RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.*

In a disability case, the combined effect of all the claimant's impairments must be considered without regard to whether any such impairment if considered separately would be sufficiently disabling. Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's 'ability to engage in substantial gainful activity.'" *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Id.* The cumulative or synergistic effect of the various impairments on the claimant's ability to work must be analyzed. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

"[I]n order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (citation omitted).

The plaintiff argues that the ALJ erred in failing to include limitations resulting from the plaintiff's depression and organic brain syndrome in his RFC finding and in the hypothetical question to the vocational expert. Specifically, the plaintiff contends that the ALJ should have included the plaintiff's explosive temper outbursts; his moderate deficits in concentration, persistence, or pace; and limitations caused by the plaintiff's low IQ and short-term memory deficits. The Commissioner argues that the RFC was based upon substantial evidence, and the hypothetical question covered these limitations by stating that the individual "reads at the fifth grade level, spells at the fourth grade level, . .. . is limited to simple, routine work; a low stress environment, and that's one that I define as requiring few decisions; no ongoing interaction with the public" (Tr. 335). This court agrees with the Commissioner that the ALJ adequately included the limitations caused by the plaintiff's low IQ. This court agrees with the plaintiff, however, that the hypothetical question does not include all of his impairments – specifically his explosive temper, short-term memory deficit, and moderate deficits in concentration, persistence, or pace. Upon remand, the ALJ should be directed to include all of the plaintiff's limitations in the hypothetical question to the vocational expert.

## CONCLUSION AND RECOMMENDATION

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. §405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.


January 29, 2010                                    s/William M. Catoe
Greenville, South Carolina                          United States Magistrate Judge